IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| SHERRY TERESA BEST,<br>Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br>Defendant. | Case No. 20–CV–00445–JPG |

## MEMORANDUM & ORDER

This is a Social Security disability appeal. Before the Court is Plaintiff-Appellant Sherry Teresa Best's Brief. (ECF No. 17). Defendant-Appellee Commissioner of Social Security responded. (ECF No. 24). For the reasons below, the Court (1) **REMANDS** this case for a rehearing and a new decision that adequately accounts for Best's limitations in the residual functional capacity and the hypotheticals posed to the vocational expert; and (2) **DIRECTS** the Clerk of Court to **ENTER JUDGMENT**.

### I.   PROCEDURAL & FACTUAL HISTORY

In 2016, Best—then 38 years old—applied for Supplemental Social Security Income with the Social Security Administration. (Tr. of Administrative R. [*hereinafter* "Tr."] at 229–34, ECF No. 14). She claims to suffer from several debilitating conditions that prevent her from engaging in gainful employment: hypertension, depression, PTSD, anxiety, antisocial personality disorder, seizures, and hyperlipidemia. (*Id.* at 115–16).

Best's mental-health conditions stem from her unfortunate upbringing. "Her parents were drug users" who physically, verbally, and emotionally abused her. (*Id.* at 119). Her uncle also "sexually abused her when she was 16." (*Id.*). She then started using drugs herself, including heroin, cocaine, and marijuana. (*Id.* at 99–100). And in 2010, she was convicted of homicide for

the death of her best friend and sister-in-law, who overdosed on heroin. (*Id.* at 119). She spent the next six years in prison, where she witnessed "[p]eople trying to commit suicide in front of her" and others getting beat up. (*Id.*). "[S]he felt violated all the time," and her paranoia increased. (*Id.*). She started experiencing "[c]rying spells, not wanting to get out of bed," agitation, "[b]ad mood swings," and feelings of hopelessness. (*Id.*).

Since being released from prison, Best has described herself as "an emotional wreck." (*Id.* at 508). She has two children with whom she does not have contact because they "are scared of her," (*id.* at 119), and accuse her of killing their aunt, (*id.* at 508). One was also diagnosed with leukemia in 2007, (*id.* at 509), which has taken a new toll on her mental health, (*id.* at 102). She "meets the criteria for PTSD," "scored highest in the area of avoidance," and also "scored high in re-experiencing." (*Id.* at 509). Indeed, Best reports experiencing hallucinations "a couple days a week." (*Id.* at 105, 527).

As for her physical ailments, Best says that she is diabetic, has high blood pressure, has had pain in her back and right foot since falling down stairs, and has had shoulder pain since getting "in a car accident when [she] was young . . . ." (*Id.* at 100–101). As a result, she says she cannot raise her arms above her head because of the shoulder pain. (*Id.* at 257).

Best underwent several phycological examinations to bolster her application. For example, Dr. Rao, a psychological consultative examiner, acknowledge Best's troubling past but said that "[s]he was able to maintain sustained focus and concentration through the evaluation process" and "appeared to have the tendency of over endorsing psychiatric symptoms." (*Id.* at 528). At the same time, Dr. Rao said that although Best "was able to register 3 random words of pencil, shoe, and clock in the first trial," she "was unable to recall any of the items after a delay." (*Id.* at 529). He said, therefore, that Best "has difficulty with concentration and working memory." (*Id.* at 531).

Best was also examined by Dr. Reintjes, who confirmed that she has "tendinopathies of the right shoulder," "[m]echanical lower back pain with a history of sacroiliitis," and "[m]edial right-sided joint pain and pain with grabbing and twisting of the right wrist secondary to a previous facture." (*Id.* at 535).

Best's physical and mental conditions, along with her felon status, have made it difficult for her to sustain employment. She admits having a problem "working with others," (*id.* at 271), and she gets "highly irritate[d]" when she feels like a coworker is "not doing their job" and management does not act, (*id.* at 99). She agrees that this issue manifests itself through "snapping at [her] coworkers," which she feels "[t]errible" about and is receiving counseling for. (*Id.* at 103–104). She has recently been working part-time at Dairy Queen, (*id.* at 98); but when asked whether she would accept a full-time position if offered, she said "no" because she "just physically can't," (*id.* at 104).

At home, Best reports living in an apartment with her cousin. (*Id.* at 94). She says she can do laundry and the dishes, as well as clean the bathroom and her bedroom; but while she can feed her cats and give them water, she relies on her aunt to take care of the rest of their needs. (*Id.* at 281–82). She needs reminders "to take a shower and shave," and she cooks simple meals (sandwiches, macaroni and cheese, and so on) for herself every other day. (*Id.* at 281). She has not driven a car in years but also stated that "[t]here should be no reason" why she cannot "except for [her] medication." (*Id.* at 98).

Ultimately, an administrative law judge ("ALJ") with the Social Security Administration held a hearing and denied Best's application for Supplemental Social Security Income. (*Id.* at 62). The decision followed the typical "five-step sequential evaluation process" used by the

Administration "for determining whether an individual is disabled." (*Id.* at 66). *See* 20 C.F.R. § 404.1520(a)(4).

At Step One, the ALJ determined that Best had "not engaged in substantial gainful activity since August 18, 2016, the application date." (*Id.* at 67).

At Step Two, the ALJ determined that Best suffers from "the following severe impairments: obesity, right shoulder and right ankle impairment, lumbar spine, and anxiety/adjustment disorder, bipolar disorder, [PTSD], antisocial personality disorder, depressive disorder, and history of polysubstance disorder." (*Id.*).

At Step Three, the ALJ determined that Best's severe impairments did not, singly or in combination, meet the requirements of a "Listed Impairment" in the Code of Federal Regulations. (*Id.* at 68). In other words, he concluded that Best is not "presumptively disabled." (*Id.*). Even so, the ALJ noted that Best has a *moderate limitation* "[w]ith regard to concentrating, persisting, or maintaining pace":

> The claimant did not allege any difficulty with completing tasks, but she did indicate that she had difficulty with concentration. She reported that she was able to pay attention for 30 minutes and that she did not finish what she started. However, she said she was able to care for pets, prepare simple meals, do laundry, clean the bathroom, clean her bedroom, shop by computer, handle money, and watch TV. In addition, Dr. Rao stated that the claimant was able to maintain sustained focus and concentration throughout the evaluation process. Dr. Rao also noted that claimant's motivation was poor, which may have influenced her performance on the mental capacity subtests. Based on the mental capacity subtests, Dr. Rao reported that it appeared the claimant had difficulty with concentration. Moreover, the claimant was able to work a part-time job at Dairy Queen for about six months prior to her hearing. This evidence supports a reasonable inference that the claimant has a moderate limitation in her ability to focus on work activities and stay on task at a sustained rate.

(*Id.* at 69).

Before moving to Step Four, the ALJ evaluated Best's residual functional capacity ("RFC"), which assessed the limitations imposed by Best's severe impairments on her ability to perform gainful work. (*Id.* at 70). In the end, the ALJ concluded that Best's "statements concerning the intensity, persistence and limiting effects" of her severe impairments were "not entirely consistent with the medical evidence and other evidence in the record . . . ." (*Id.* at 72). First, the ALJ went through Best's progress notes from 2015 to 2018, which reflected that Best repeatedly "complained of right shoulder pain"; "sciatic pain into the bilateral lower extremities"; and an inability to walk for more than 15 minutes, sit for more than hour, lift more than 10 pounds, or stand in one spot. (*Id.*). He noted that Best likely suffers from "tendinopathies of the right shoulder, mechanical lower back pain with a history of sacroiliitis, and medial right sided joint pain and pain with grabbing and twisting of the right wrist secondary to previous fracture." (*Id.*). That said, the ALJ said that Best "reported feeling better" in 2017 and 2018; and that "she was ambulating normally, she had normal tone and motor strength, but limited range of motion and complaints of right foot pain." (*Id.* at 73). Along those lines, despite Best's "right shoulder, right ankle, lumbar spine, and obesity," the ALJ found that her "activities of daily living . . . are inconsistent with the limitation she alleged." (*Id.*). The ALJ noted Best's testimony that she could "care for pets, prepare simple meals, do laundry, clean the bathroom, clean her bedroom, shop by computer, handle money, and watch TV." (*Id.* at 74). He also found that Best's "reported ability to work six days a week at a fast food restaurant; her lack of specialty follow up; the consultative exam; and her more recent, essentially normal physical examinations do not support further limitations." (*Id.*). The ALJ then went through more medical records to support his conclusion that Best's "mental limitations . . . are only partially supported by evidence in the record," (*id.*):

- The ALJ cited medical records from June and July 2016 suggesting that Best "refused to use coping skills and insisted upon medications. On exam, she was appropriately groomed; cooperative; oriented to time, place, and person, and her thought process was clear and coherent." (*Id.*)

- The ALJ cited medical records from August 2016 suggesting that although Best reported having depression, high anxiety, and a history of visual hallucinations, she appeared "alert and oriented . . . , her thought process was intact and organized, thought content was goal directed, mood anxious with congruent affect, her speech was coherent with normal rate and volume, she was cooperative and forthcoming with appropriate posture, with no observable preoccupation with external stimuli. She had appropriate eye contact[,] her appearance was age and weather appropriate, she was well groomed and clean, her memory and recall appeared within normal limits, and her expressive and receptive language was within normal limits." (*Id.*). That said, the ALJ acknowledged that Best "did have poor judgment and insight." (*Id.*).

- The ALJ cited medical records from October 2016 suggesting that Best's "mental status exam was essentially normal. (*Id.* at 75). Best said she was having difficulty finding a job because of her felon status. (*Id.*). Even so, "she was alert and oriented; conversation was logical and organized; had poor confidence and anxious and depressed mood; with normal language and speech; normal memory and recall; fair judgment and poor insight"; and "was cooperative and forthcoming and she had adequate grooming and hygiene." (*Id.*).

- The ALJ cited medical records from November 2016 suggesting that Best's "mentation was within normal limits" and the she "appeared to have a tendency to over endorse her psychiatric symptoms and her motivation was somewhat limited, which may have influenced her performance to some extent." (*Id.*). Still, Best "stated that due to her back pain, she was unable to work or sit long. She indicated that she was able to do the laundry and dishes. The diagnostic impressions included adjustment disorder with depressed mood vs. mild to moderate depressive disorder, mild to moderate anxiety disorder, and heroin dependence disorder in full remission." (*Id.*).

- The ALJ cited medical records from December 2016 suggesting that Best "had poor confidence and hopelessness with an anxious and depressed mood, but the rest of her mental status exam was essentially normal." (*Id.*).

- The ALJ cited medical records from January 2017 suggesting that Best "was fired from her job at Subway due to a 'miscommunication' over what days she was supposed to work." (*Id.*). "Her mental status exam," however, "was essentially normal," with depressive feelings "centered around interactions with her daughter." (*Id.* at 76).

- The ALJ cited medical records from March and April 2017 suggesting that Best reported "high levels of stress . . . due to interactions with her daughter and her inability to find a job." (*Id.*). But despite her "depressed mood and congruent affect, her mental status exam was essentially normal." (*Id.*). Best also "reported that she felt not having reliable transportation was a 'huge limitation' " keeping her from finding a job. (*Id.*).

- The ALJ cited medical records from June 2017 suggesting that Best "had been out of her medications for a few days, and reported visual hallucinations and seeing people. However, she stated she was doing well up until she ran out of her medications. On exam, she had an anxious and depressed mood and a congruent affect and her behavior was anxious upset, but overall calm. The remainder of her mental status exam was essentially normal." (*Id.*). Best later again "reported that she was seeing things but she could not figure out who it was and stated she felt like someone was there. She stated she was working at Subway and was having problems getting along with a coworker who was purposely rude to her." (*Id.*). Finally, she "reported she was wrongly fired from her job at Subway and that she had been fired about a week before. She indicated she was planning to return to school and said she was looking forward to it." (*Id.*).

- The ALJ cited medical records from September 2017 suggesting that Best "reported that she felt her medications were effective and attributed her depressed mood to life circumstances. She said she felt like bugs were crawling on her and stated she saw silhouettes of her best friend who passed away." (*Id.*).

- The ALJ cited medical records from March 2018 suggesting that Best "reported having depression and anxiety, and on exam, she had poor insight with an anxious and depressed mental status." (*Id.*). Best also "reported that she was hired at Dairy Queen. . . . [A]fter just a few sessions, [Best] was being more open, was able to talk without becoming emotionally upset, and that talking through issues was helping her." (*Id.*).

- The ALJ cited medical records from April 2018 suggesting that Best "had a bland affect with good eye contact; her speech was articulate; her attitude cooperate and polite; her memory good; cognition good; she was oriented times three; her intellect average; her attention and concentration good; her insight and judgment good; and her impulse control and frustration tolerance were good." (*Id.* at 76–77). Although Best "reported racing thoughts, worrying about her children, and hearing voices and seeing silhouettes," the medical records reflected that "on exam, she had good judgment; normal mood and affect; she was active and alert; oriented to time, place, and person; and her recent and remote memory were normal." (*Id.* at 77).

- The ALJ cited medical records from May 2018 suggesting that Best had missed several therapy appointments because "she had been working six days a week for the past two and a half months." (*Id.*). "On exam, she had good eye contact; was cooperative; her mood and affect were depressed, anxious, and tearful with irritability; her speech was slightly rapid and louder than normal; she denied suicidal or homicidal ideation; she was alert and oriented; her memory and concentration were grossly intact; and she had fair judgment and insight." (*Id.*).

- The ALJ cited medical records from June 2018 suggesting that Best reported "working a lot, getting home late, and having issues with her living situation. She indicated her medication was working better with some decrease in her anxiety. She reported persistent low energy and low motivation and mood changes but felt it was more related to situational stressors and her menstrual cycle. She said she was interested in going back to school for business, criminal justice, and a psychology doctorate." (*Id.*). Best also "denied hallucinations," appeared "alert and fully oriented," had normal "memory and concentration," and exhibited "fair insight and judgment." (*Id.*).

- The ALJ cited medical records from August and September 2018 suggesting that Best "reported she was having a hard time because her family had passed away two week[s] before," that "she had lost significant weight over the past six months and she said she was unable to afford much food." (*Id.*). Thankfully, when she returned three weeks later, "her constitutional and psychiatric exams were essentially normal." (*Id.*).

With that in mind, the ALJ then weighed the opinions of different medical consultants who examined Best. Dr. Shaw gave the first opinion—that Best "was limited to light work with occasional overhead reaching with the right upper extremity." (*Id.* at 78). The ALJ gave Dr. Shaw's opinion **little weight** because there was "updated evidence at the reconsideration and hearing levels" suggesting that Best "is less limited." (*Id.*). More specifically, the ALJ addressed Dr. Khorshidi's subsequent opinion that Best "did not have a severe physical impairment." (*Id.*). There too, however, the ALJ gave Dr. Khorshidi's opinion **little weight** because his evaluation of the medical evidence still confirmed Best's "obesity, right shoulder, right ankle, and lumbar spine" impairments. (*Id.*). As for Dr. Donahoo and Dr. Phillips, "the State agency's psychological consultants," "[t]hey determined that [Best] was capable of performing the basic mental demands of unskilled work." (*Id.*). But the ALJ also gave their opinions **little weight**—instead, he gave Best's "testimony the benefit of the doubt regarding her difficulty with coworkers and her reports of having problems with changes" and found that she "should be limited to frequent contact with coworkers and the public and only frequent changes to the workplace setting." (*Id.*). Finally, the ALJ gave Dr. Rao's opinion **some weight**, noting that although Dr. Rao thought Best "appeared to over endorse her psychiatric symptoms," she did, in fact, have "difficulty with concentration and working memory based on her mental capacity subtests." (*Id.*).

The entire RFC assessment spanned eight pages. (*Id.* at 70–78). In the end, the ALJ was "persuaded that" Best's mental-health issues limited her "to unskilled work with frequent

interaction with coworkers and the public and frequent changes to the work setting." (*Id.* at 77). But he was not convinced that Best was incapable of *any* work given her general ability to care for herself and her household; her "reported improvement with medication and therapy; Dr. Rao's indication that she exaggerates her mental health symptoms; her reported ability to work six days a week as a cashier at Dairy Queen; and her statements that she is not able to find a job due to transportation issues or her criminal history . . . ." (*Id.* at 77–78). So "[t]aking into consideration [Best's] subjective complaints, as well as the objective medical evidence," (*id.* at 78), the ALJ concluded that Best has the following RFC:

> [Best] has the residual functional capacity to perform medium work . . . except she can frequently push and pull with the right upper extremity and can never climb ladders, ropes, or scaffolding. She can perform simple, goal-oriented tasks. No production rate pace. She can follow simple instructions and can make simple decisions. She can have frequent contact with coworkers and frequent work related contact with the public. She can tolerate only frequent changes to the work place setting.

(*Id.* at 70).

With Best's RFC established, the ALJ determined at Step Four that she is still "capable of performing past relevant work as a fast food worker." (*Id.* at 78). This conclusion partly stemmed from the testimony given by a vocational expert during an in-person hearing. (*See id.* at 109–13). The ALJ asked the vocational expert to testify hypothetically whether, based on the RFC, there are jobs that Best could still do:

> If you would please consider a hypothetical individual that has [Best's] age, education and work experience; this hypothetical person will have the following limitations: medium exertional level; frequent right upper extremity push/pull; and never ladders or ropes or scaffolding; would be restricted to performing simple goal oriented task[s], one to three steps; not at production rate pace; can follow simple instructions; and can make simple decisions; can have frequent contact with coworkers and frequent work-related contact with the public and can tolerate frequent

> changes to the workplace setting, could such an individual perform any of [Best's] past work?

(*Id.* at 110–11). In response, the vocation expert stated that such hypothetical person could still work as a fast-food worker. (*Id.* at 111). The vocational expert also stated, however, that a worker may be "incapable of maintaining competitive work" if she is off-task for more than 10 percent of the workday. (*Id.*). In the end, the ALJ apparently agreed, concluding that because Best could still work as a fast-food worker, she is not disabled. (*Id.* at 79–80).

Best appealed to this Court under 42 U.S.C. § 405(g), which authorizes judicial review of the Social Security Administration's denial of benefits. She argues that the ALJ erred in two ways: (1) "The ALJ failed to account for [her] moderate limitation in concentration, persistence, and pace in the RFC," (Best's Brief at 14–16), and; (2) "The RFC was based on the ALJ's own lay interpretation of raw medical data, rather than upon substantial evidence," (*id.* at 17–20).

## II.   LAW & ANALYSIS

In reviewing the Social Security Administration's benefits decisions, the Court treats its findings as conclusive "so long as they are supported by 'substantial evidence.' " *Beistek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019) (citing 42 U.S.C. § 405(g)). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). This only requires the Court to determine "whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). The Court must "conduct a critical review of the evidence" without reweighing it or substituting its own judgment for that of the ALJ. *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011). But

regardless of the volume of evidence in support of the factual findings, reversal is required if the ALJ committed an error of law. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

### A. ALJ's Evaluation of Best's Limitations in Concentration, Persistence & Pace

The Seventh Circuit has reiterated "[a]gain and again . . . that when an ALJ finds there are documented limitations of concentration, persistence, and pace, the hypothetical question presented to the [vocational expert] must account for these limitations." *Winsted v. Berryhill*, 923 F.3d 472, 476–77 (7th Cir. 2019) (collecting cases). In *Winsted*, for example, "the ALJ acknowledged" at Step Three that the claimant "had moderate difficulty with social functioning and concentration, persistence, and pace because of his mental-health issues." *Id.* at 476. An agency phycologist, for example, determined that the claimant "had below average levels of mental control, understanding and memory, and concentration; poor levels of persistence; and he did not do well in social situations." *Id.* at 475. The ALJ agreed—yet neither the hypothetical question posed to the vocational expert nor the residual functional capacity accounted for those difficulties. *Id.* While the hypothetical posed to the vocational expert posited a person "limited to only simply reaching, repetitive tasks, with few workplace changes, no team work, and no interactions with the public," (*id.* at 476), the Seventh Circuit said that was not enough, (*id.* at 477). For one thing, the hypothetical seemingly accounted for the claimant's difficulties with social interaction; but the claimant "often appeared tense, anxious, and/or reckless *without interacting with other people*." *Id.* (emphasis in original) (quotation marks omitted). Similarly, the vocational expert testified that "an individual who would either be off task 20% or would have two unscheduled absences per month—seemingly having in mind someone with 'moderate difficulties with concentration, persistence, and pace'"—could not sustain employment. *Id.* Yet those responses were also not "reflected in the ALJ's decision." *Id.* In sum, the Seventh Circuit remanded for a rehearing because

the ALJ did not account for his own findings that the claimant suffered from "documented limitations of concentration, persistence, and pace." *See id.* at 476–77.

The takeaway is that an "ALJ generally may not rely merely on catch-all terms like 'simple, repetitive tasks'" when posing hypotheticals to a vocational expert "because there is no basis to conclude that they account for problems of concentration, persistence or pace." *Crump v. Saul*, 932 F.3d 567, 570 (7th Cir. 2019). So "for most cases, the ALJ should refer expressly to limitations on concentration, persistence and pace in the hypothetical in order to focus the [vocational expert's] attention on these limitations and assure reviewing courts that the [vocational expert's] testimony constitutes substantial evidence of the jobs a claimant can do." *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 621 (7th Cir. 2010).

Here too, the ALJ concluded at Step Three that Best has moderate difficulty with concentration, persistence, and pace because of her mental-health issues. While he noted that Best can generally take care of her appearance and household, the ALJ also recognized that Best reported only being able to pay attention for 30 minutes and that she did not finish what she started. He gave some weight to Dr. Rao's opinion that Best tended to exaggerate her condition, yet also credited Dr. Rao's report that Best struggled to concentrate during the mental capacity subtest. And despite having worked part-time at Dairy Queen, the ALJ still concluded that Best has a "moderate limitation in her ability to focus on work activities and stay on task at a sustained rate." The RFC assessment, however, glosses over such moderate limitation. The Commissioner argues, however, that the ALJ accounted for it by emphasizing her ability to "perform simple, goal-oriented tasks"; "follow simple instructions and . . . make simple decisions"; and to work not at "production rate pace." (*See* Comm'r's Brief at 11–13). The ALJ then repeated that in the hypothetical given to the vocational expert, which—according to the Commissioner—was enough

to account for Best's moderate limitation in concentration, persistence, and pace. The Court disagrees.

While the RFC and hypotheticals accounted for Best's inability to work at a production-rate pace, they neglected her difficulties with concentration and persistence. The Commissioner points to *Jozefyk v. Berryhill*, where the Seventh Circuit found that an ALJ's failure to "adequately account for [the claimant's] moderate limitations in concentration, persistence, or pace" was harmless. 923 F.3d 492, 987–98 (7th Cir. 2019). But the claimant in that case had merely "reported memory difficulties," while the agency psychologists "found no indication of cognitive or memory problems." *Id.* at 494. Even so, the ALJ still found that the claimant suffered from " 'moderate' difficulties in social functioning and concentration, persistence, or pace." *Id.* at 495. To account for that, the RFC "included accommodations for a 'mild mental functional impairment.' " *Id.* at 497. The Seventh Circuit concluded that such a limitation was adequately tailored around the claimant's social anxiety. *Id.* at 498. In any event, given that the claimant's memory and concentration were only slightly impaired, the claimant was unable to prove how "those deficits [kept] him from performing simple, routine, and repetitive tasks." *Id.* at 498. The same cannot be said here. For one, unlike *Jozefyk*, the RFC did not include an accommodation for Best's moderate limitation in concentration and persistence. Though the Commission claims that he did, pointing to the limitation for "simple, goal-oriented tasks" and "simple instructions," the Seventh Circuit has repeated time and again that " 'employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the [vocational expert's] consideration those positions that present significant problems of concentration, persistence and pace,' and thus, alone, are insufficient to present the claimant's limitations in this area." *Winsted*, 923 F.3d at 477 (quoting *O'Connor-Spinner*, 627 F.3d at 620)). Perhaps more importantly, Best's moderate limitation was

corroborated by medical evidence, also unlike *Jozefyk*. For example, Dr. Rao recognized that Best's mental capacity subtest confirmed her reported difficulty with concentration. Indeed, the ALJ found that this limitation influenced Best's ability to stay on task at a sustained rate. Yet that finding was not reflected in either the RFC or the hypothetical given to the vocational expert, who acknowledged that a failure to stay on task at a sustained rate could affect a claimant's capacity to maintain competitive work. As Best notes, "there is the distinct possibility, especially from the ALJ's determination that [Best] had a moderate limitation in concentration, that she may not be able to maintain the concentration necessary to perform such work without exceeding employer tolerances for off-task behavior." (Best's Brief at 16). The Court will therefore remand this case for a rehearing and a new decision that adequately accounts for Best's limitations in the RFC and the hypotheticals posed to the vocational expert.

### B.  ALJ's Evaluation of Best's Residual Functional Capacity

"When assessing an ALJ's credibility determination," the Court does not "undertake a *de novo* review of the medical evidence that was presented to the ALJ." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Rather, the Court "merely examine[s] whether the ALJ's determination was reasoned and supported." *Id.* Put differently, "[i]t is only when the ALJ's determination lacks any explanation or support that [the Court] will declare it to be 'patently wrong' and deserving of reversal." *Id.* at 413–14 (quoting *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)). In sum, the Court's "role is extremely limited" and must take care not "to displace the ALJ's judgment by reconsidering factors or evidence, or by making independent credibility determinations." *Id.* at 413.

Best argues that the ALJ erred by basing the RFC on his "own lay interpretation of raw medical data." (Best's Brief at 17). More specifically, she objects to the little weight the ALJ gave

Dr. Shaw, Dr. Khorshidi, Dr. Donahoo, and Dr. Phillips's opinions. Best claims that the ALJ's discounting of these opinions was "problematic as the ALJ considered as a layperson the medical evidence, and such action by the ALJ was not permitted." (*Id.* at 18). The Court disagrees.

The ALJ provided specific reasons for why he discounted the opinion evidence, none of which were patently wrong. As for Dr. Shaw's opinion, the ALJ found it outdated and unsupported by Dr. Khorshidi, who "was able to review more of [Best's] medical evidence and determined the [she] did not have a severe physical impairment." (Tr. at 78). Even so, the ALJ gave Dr. Khorshidi's opinion little weight—*to Best's benefit*—because the ALJ acknowledged that Best does, in fact, suffer from "obesity, right shoulder, right ankle, and lumbar spine" pain, supporting a limitation "to a reduced range of medium work . . . ." (*Id.*). Similarly, the ALJ gave the opinions of Dr. Donahoo and Dr. Phillips little weight *to Best's benefit*: The ALJ gave Best's "testimony the benefit of the doubt regarding her difficulty with coworkers and her reports of having problems with changes," therefore supporting a limitation "to frequent contact with coworkers and the public and only frequent changes to the work place setting." (*Id.*). And the ALJ only gave Dr. Rao's opinion some weight because, on one hand, he said that Best exaggerates her symptoms; and on the other, Best's mental capacity subtests confirmed that she struggles to concentrate and has poor working memory. (*Id.*). While Best claims that the ALJ "failed to set forth a thorough and logical explanation of [her] symptoms on her ability to work," (Best's Brief at 18), the ALJ provided an eight-page narrative to support his conclusion that Best's statements about the intensity, persistence, and limiting effects of her severe impairments contradicted the medical record. This included accounts noting that Best appeared "alert and oriented," "her memory and recall appeared within normal limits," "mental status exam was essentially normal," "normal memory and recall," "mentation was within normal limits," "mental status exam was essentially normal," and "her

constitutional and psychiatric exams were essentially normal." To be sure, this Court is not tasked with reweighing the evidence: By all accounts, Best suffers from significant trauma that manifests itself in severe anxiety, even hallucinations; but the Court need only ask whether the ALJ's built an accurate and logical bridge between the evidence and his conclusion that Best is not disabled. And he did—even if reasonable minds disagree with the result. So aside from the ALJ's failure to account for Best's limitations in the RFC and hypotheticals, the decision was supported by substantial evidence.

### III.   CONCLUSION

The Court (1) **REMANDS** this case for a rehearing and a new decision that adequately accounts for Best's limitations in the residual functional capacity and the hypotheticals posed to the vocational expert; and (2) **DIRECTS** the Clerk of Court to **ENTER JUDGMENT**.

**IT IS SO ORDERED.**

**Dated: Tuesday, July 27, 2021**

<u>S/J. Phil Gilbert</u>
**J. PHIL GILBERT**
**UNITED STATES DISTRICT JUDGE**
